Nos. 23-15865, 23-15989

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

NARCISO FUENTES,
*Plaintiff-Appellant/Plaintiff-Cross-Appellee*,

v.

DISH NETWORK, LLC,
*Defendant-Appellee/Defendant-Cross-Appellant*,

_____

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:16-cv-02001-JSW,
Honorable Jeffrey S. White

_____

APPELLANT AND CROSS-APPELLEE NARCISO FUENTES' COMBINED
RESPONSE AND REPLY BRIEF

_____

HOUSING & ECONOMIC RIGHTS
ADVOCATES
ARTHUR D. LEVY
Cal. Bar No. 095659
610 – 16th Street, Suite 420
Oakland, CA 94612
Telephone: (415) 702-4551
Facsimile: (415) 814-4080
Email: arthur@yesquire.com

CONN LAW, PC
ELLIOT J. CONN
Cal. Bar No. 279920
354 Pine St., 5th Floor
San Francisco, CA 94104
Telephone: (415) 417-2780
Facsimile: (415) 358-4941
Email: elliot@connlawpc.com

Attorneys for Appellant/Cross-Appellee Narciso Fuentes

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES................................................................. IV

INTRODUCTION.............................................................................1

SUPPLEMENTAL STATEMENT OF THE CASE..............................1

STATEMENT OF THE ISSUES ON CROSS-APPEAL....................4

SUMMARY OF ARGUMENT.........................................................5

IN OPPOSITION TO DISH'S CROSS-APPEAL.............................5

ARGUMENT IN OPPOSITION TO DISH'S CROSS-APPEAL ......................6

1.    California's Home Solicitation Sales Act Applies to Contracts "Made" at
Other than the Seller's Appropriate Trade Premises ...................................6

a.   The District Court Correctly Determined that DISH Violated the HSSA

and, Consequently, the CLRA, and UCL .......................................................8

i.     Section 1689.5(a) Is Clear and Unambiguous that the HSSA Applies
to Buyer-Initiated Calls in Which the Seller Makes an Offer and the Buyer
Accepts..........................................................................................................9

ii.    DISH Fails to Show Any Ambiguity in Section 1689.5(a); Indeed,
Below DISH Asserted It Was Clear........................................................11

iii.   The Legislative Counsel's Analysis Confirms the Correctness of the
*Travelers* Rule that the Place Where the Offer is Accepted is the Place
Where the Contract Is Made .................................................................13

iv.    Case Law Refute Any Categorical Exclusion of Buyer-Initiated
Contracts. ................................................................................................16

b.  DISH Fails to Address the Alternative Bases for Denying DISH Summary Judgment that the Court Found Unnecessary to Address After Ruling that DISH Was the Offeror ......................................................19

i.  The Right to Cancel the Installation Rendered any "Oral Contract" Illusory ......................................................20

ii.  There Was Ample Evidence Before the District Court that No Contract Was Formed Until Fuentes Signed DISH's Required Standard DHAP and Accepted Its RCA ......................................................22

iii.  There Was Ample Evidence Before the District Court that the DHAP DISH Required Fuentes to Sign Contained Additional Terms that at a Minimum Modified the "Oral Contract" and Brought it Within the HSSA ......................................................25

2.  DISH Does Not Dispute That Its Contracts Violate the HSSA's Requirements ......................................................30

3.  DISH's HSSA Violations Serve as Predicate Violations of the UCL and the CLRA ......................................................30

4.  DISH's "Absurd Result" Argument Is Without Merit ......................................................31

**LEGAL ARGUMENT IN SUPPORT OF FUENTES' PRINCIPAL BRIEF** .35

1.  Section 1447(c) Required the District Court to Remand the Claims to the Extent they Requested Public Injunctive Relief ......................................................35

2.  DISH's Arguments Against Remand Based on its "Claim Versus Remedy" Distinction and "Claim Splitting" Lack Merit ......................................................38

a.  The District Court Did Not Adjudicate, Address, or "Dispose" of Fuentes' Claims to the Extent They Requested Public Injunctive Relief ......................................................39

i.  The District Court's Summary Judgment Order Left Unadjudicated *Claims* to Remand ......................................................40

ii

ii.    The Federal Rules of Civil Procedure Treat Each Remedy as an Integral Part of a "Claim" ...........................................................40

iii.    The Federal Courts' "Unflagging Obligation" to Adjudicate All Controversies Within Their Subject Matter Jurisdiction Negates DISH's "Claim" Versus "Remedy" Distinction.....................................42

iv.    The Remedy-By-Remedy Standard for Article III Standing Negates DISH's "Claim" Versus "Remedy" Distinction........................................44

v.    *Vaughn v. Tesla* Does Not Support the Denial of Fuentes' Remand Motion........................................................................................45

b.    DISH's Claim Splitting Argument Is Without Merit ...............................46

i.    DISH Does Not Dispute that for Claim Preclusion, "Claim Splitting" Only Applies in *Serial* or *Successive* Lawsuits, Which Are Absent Here ................................................................................46

ii.    DISH's New Argument Based on Claim Splitting in *Simultaneous* Litigation Is Without Merit........................................................48

3.    DISH's Claimed District Court "Weight of Authority" Was Wrongly Decided, and None of It is Binding on this Court .....................................52

4.    DISH's Did Not Raise Most of Its Remaining Arguments Below, and They Are, In Any Event, Without Merit .....................................................53

a.    DISH Impermissibly Argues the Merits of the Public Injunction Claims 53

b.    A "Waste of Resources" Cannot Create Jurisdiction ...............................56

c.    DISH's Attempt to Shift Its Jurisdictional Risks onto Fuentes Is Irrelevant and Unfounded....................................................................................57

**CONCLUSION**.................................................................................................59

**CERTIFICATE OF COMPLIANCE** ................................................................60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrego Abrego v. The Dow Chem. Co.*,
    443 F.3d 676 (9th Cir. 2006) ............................................................57

*Adams v. Cal. Dep't of Health Servs.*,
    487 F.3d 684 (9th Cir. 2007) ...................................................... 50, 51

*Alameda Cty. v. Ross*,
    32 Cal. App. 2d 135 (1939) ...........................................................20

*Alch v. Superior Court*,
    122 Cal. App. 4th 339 (2004) ........................................................12

*Aluminum Shake Roofing, Inc. v. Hirayasu*,
    110 Haw. 248 (2006) ....................................................................18

*Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*,
    843 F.2d 1253 (9th Cir. 1988) .......................................................43

*Beley v. Mun. Ct.*,
    100 Cal. App. 3d 5 (1979) .............................................................17

*Cal. Teachers Ass'n v. Governing Bd. of Rialto Unified Sch. Dist.*,
    14 Cal. 4th 627 (1997) ..................................................................34

*Clifford v. Quest Software Inc.*,
    38 Cal. App. 5th 745 (2019) ..........................................................55

*Colo. River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976) ......................................................... 42, 43, 51

*Columbia Pictures Corp. v. De Toth*,
    87 Cal. App. 2d 620 (1948) .............................................. 23, 24, 28, 29

iv

*County of Allegheny v. Frank Mashuda Co.*,
360 U.S. 185 (1959) ........................................................................42

*D'Iorio v. Winebow, Inc.*,
68 F. Supp. 3d 334 (E.D.N.Y. 2014) ...............................................41

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2017) ...........................................................58

*Donaher v. Porcaro*,
47 Mass. App. Ct. 650 (1999) ..........................................................19

*Donovan v. Rrl Corp.*,
26 Cal. 4th 261 (2001) .....................................................................33

*Erhart v. DirecTV, Inc.*,
2012 WL 2367426, No. N10C09019 PLA (Del. Super. June 20, 2012).............18

*Ernest Bock, LLC v. Steelman*,
76 F.4th 827 (9th Cir. 2023) ............................................................43

*Esberg v. Union Oil Co.*,
28 Cal. 4th 262 (2002) .....................................................................12

*Geneva Int'l Corp. v. Petrof, Spol, S.R.O.*,
608 F. Supp. 2d 993 (N.D. Ill. 2009) ...............................................41

*Giannakos v. M/V Bravo Trader*,
762 F.2d 1295 (5th Cir. 1985) .........................................................57

*Hanscom v. Reynolds Consumer Prod. LLC*,
No. 21-CV-03434-JSW, 2022 WL 591466 (N.D. Cal. Jan. 21, 2022).............58

*Harris v. Time, Inc.*,
191 Cal. App. 3d 449 (1987).............................................................33

*Henderson v. Shinseki*,
562 U.S. 428 (2011) .................................................................. 56, 57

*Hernandez v. Wells Fargo & Co.*,
No. C 18-07354 WHA, 2019 WL 3017657 (N.D. Cal. July 10, 2019) ................4

v

*Hodges v. Comcast Cable Communs., Ltd. Liab. Co.*,
  21 F.4th 535 (9th Cir. 2021) ...............................................................54

*Hollywood Decorators, Inc. v. Lancet*,
  461 N.Y.S.2d 955 (Sup. Ct. 1983) .....................................................18

*Hulsey v. Koehler*,
  218 Cal. App. 3d 1150 (1990)..............................................................47

*In re Coca-Cola Prod. Mktg. & Sales Pracs. Litig. (No. II)*,
  No. 20-15742, 2021 WL 3878654 (9th Cir. Aug. 31, 2021)...............58

*In re D.B.*,
  58 Cal. 4th 941 (2014) ........................................................................12

*Joseph v. J.J. Mac Intyre Companies, L.L.C.*,
  238 F. Supp. 2d 1158 (N.D. Cal. 2002)...............................................32

*Kanciper v. Suffolk Cty. SPCA, Inc.*,
  722 F.3d 88 (2d Cir. 2013) ..................................................................51

*Katz v. Gerardi*,
  655 F.3d 1212 (10th Cir. 2011) ...........................................................51

*King v. Pac. Gas & Elec. Co.*,
  82 Cal. App. 5th 440 (2022).................................................................32

*Lee v. Am. Nat'l Ins. Co.*,
  260 F.3d 997 (9th Cir. 2001) ........................................... 36, 37, 38, 39

*Louis Luskin & Sons, Inc. v. Samovitz*,
  166 Cal. App. 3d 533 (1985).......................................................... 10, 17

*Love v. Villacana*,
  73 F.4th 751 (9th Cir. 2023) ................................................................57

*Magadia v. Wal-Mart Assocs., Inc.*,
  999 F.3d 668 (9th Cir. 2021) ......................................................37, 38, 39

*Maldonado v. Fast Auto Loans, Inc.*,
  60 Cal. App. 5th 710 (2021)........................................................... 54, 55

*Mendoza v. Amalgamated Transit Union Int'l,*
  30 F.4th 879 (9th Cir. 2022) ...................................................................50

*Mercury Interactive Corp. Sec. Litig.,*
  618 F.3d 988 (9th Cir. 2010) ...................................................................53

*Morris v. Steffes Grp., Inc.,*
  924 N.W.2d 491 (Iowa 2019) ...................................................................18

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.* (*Moses Cone*),
  460 U.S. 1 (1983) ....................................................................................43

*Myers v. Superior Court,*
  78 Cal. App. 5th 1127 (2022) ...................................................................32

*Nat'l Controls v. Commodore Bus. Machs.,*
  163 Cal. App. 3d 688 (1985) ....................................................................29

*Paul v. Layne & Bowler Corp.,*
  9 Cal. 2d 561 (1937) ................................................................................21

*People v. Gonzales & Soliz,*
  52 Cal. 4th 254 (2011) .............................................................................54

*People v. Heard,*
  83 Cal. App. 5th 608 (2022) .....................................................................32

*People v. Toomey,*
  157 Cal. App. 3d 1 (1984) ..................................................................10, 11

*People v. Weidert,*
  39 Cal. 3d 836 (1985) ..............................................................................12

*Republic Tobacco, L.P. v. North Atlantic Trading Co., Inc.,*
  254 F. Supp. 2d 985 (N.D. Ill. 2002) .......................................................41

*Roley v. Google LLC,*
  40 F.4th 903 (9th Cir. 2022) ....................................................................33

*Sosna v. Iowa,*
  419 U.S. 393 (1975) .................................................................................57

*Switzer v. Wood*,
    35 Cal.App.5th 116 (2019)..........................................................................31

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ...............................................................................44

*Travelers Ins. Co. v. Workmen's Compl. App. Bd.*,
    68 Cal. 2d 7 (1967) ..................................... 5, 10, 11, 13, 14, 19, 31, 34

*Vanover v. NCO Fin. Servs.*,
    857 F.3d 833 (11th Cir. 2017) .................................................................51

*Vaughn v. Tesla, Inc.*,
    87 Cal. App. 5th 208 (2023)............................................................. 45, 55

*Walczak v. Chi. Bd. of Educ.*,
    739 F.3d 1013 (7th Cir. 2014) .................................................................50

*Weatherall Aluminum Products Co. v. Scott*,
    71 Cal. App. 3d 245 (1977)............................................................... 10, 17

*Wells v. One2One Learning Foundation*,
    39 Cal. 4th 1164 (2006) ............................................................................12

*Williams v. Kapilow & Son, Inc.*,
    105 Cal. App. 3d 156 (1980)............................................................. 10, 17

*Wis. Dep't of Corr. v. Schacht*,
    524 U.S. 381 (1998).................................................................................36

**Statutes**

28 U.S.C. § 1447(c) .................................................. 36, 37, 38, 42, 46, 52

6 Del. Code § 4403(3)...............................................................................18

Cal. Civ. Code § 1624(a)(1)......................................................................21

Cal. Civ. Code § 1689.13 ................................................................... 17, 18

Cal. Civ. Code § 1689.5(a)................................. 6, 7, 9, 11, 13, 17, 29, 31

Cal. Civ. Code § 1689.6(a)(1)..................................................................6, 30

Cal. Civ. Code § 1689.7(a)(1)..................................................................6, 30

Cal. Civ. Code § 1689.7(c)...........................................................................6

Cal. Civ. Code § 1689.7(f)............................................................................6

Cal. Civ. Code § 1689.7(g).......................................................................7, 30

Cal. Civ. Code § 1770(a)(14)......................................................................30

Cal. Civ. Code, § 1689.5(c).........................................................................32

Cal. Comm, Code § 2207(2).........................................................................29

California Home Solicitation Sales Act, Cal. Civ. Code § 1689.5, *et seq.*.............1, 6

California Private Attorneys General Act, Cal. Labor Code § 2698, *et seq.*...........37

U.S. Const. Art. III, § 2, Cl. 1 ....................... 1, 37, 38, 44, 46, 48, 52, 53, 56, 57, 58

**Rules**

FRCP 12(b)(6).............................................................................................11

FRCP 56(a)..................................................................................................40

FRCP 56(g)..................................................................................................41

FRCP 8(a)....................................................................................................40

**Other Authorities**

14 Cal. Jur. 3d Contracts § 148 ..................................................................20

RESTATEMENT (SECOND) CONFLICT OF LAWS ...........................................34

RESTATEMENT (SECOND) OF CONTRACTS ....................................... 22, 24

WITKIN, CALIFORNIA PROCEDURE..............................................................47

WITKIN, SUMMARY OF CALIFORNIA LAW ..................................................... 22, 33, 34

## INTRODUCTION

Narciso Fuentes brought this action to put an end to DISH Network, LLC violations California's Home Solicitation Sales Act, that is, its refusal to provide in-kind language translations of its contracts, cancellation right disclosures, or honor cancellation requests. The district court had little trouble entering summary judgment in Fuentes' favor, finding either Fuentes had agreed to DISH's terms at his home, thus consummating a contract away from "appropriate trade premises" that was therefore covered by the HSSA, or alternatively, that no contract was formed until Fuentes later signed DISH's form written contracts at his home, which were covered by the HSSA. DISH's arguments to the contrary require the Court to re-write basic California contract law.

While the district court correctly found that DISH violated the HSSA, it erred in denying Fuentes' request to remand the unadjudicated claims for public injunctive relief, for which it is undisputed that Fuentes lacks Article III standing. Fuentes asks the Court to affirm the district court's summary judgment order and to reverse the denial of remand.

## SUPPLEMENTAL STATEMENT OF THE CASE

Fuentes supplements his Statement of the Case to include additional facts, necessary to address the issues raised below in opposing DISH's motion for summary judgment:

When a consumer places a telephone call to DISH in response to DISH promotional advertising, they are connected to a DISH representative at a remote DISH call center. 3-ER-478-79 (18:8-19:6); 3-ER-481-83 (25:17-27:17). During these initial calls, the DISH customer service representative quotes a service "plan" to the customer, provides certain disclosures, and arranges a date for the installation of service at the customer's home. 3-ER-478-79 (18:22-19:22); 3-ER-484-85 3 (2:17-33:17).

DISH representative Paulina Nuñez was trained to follow "sales flow" procedures, including disclosures, that DISH required for call center representatives at that time. 3-ER-485-90 (33:16-33:5, 37:21-38:13); 3-ER-509. In the August 6 phone call, Nuñez first had Fuentes provide information for a "credit application" and a credit card number and social security number for him to "qualify" for an "offer." 4-ER-658-60. Nuñez then pulled Fuentes' credit history to determine his eligibility for DISH programming packages. 4-ER-659. She then presented him with a DISH programming option for which he was eligible. 4-ER-658-64; 4-ER-679-680. Fuentes agreed to go ahead with the installation of the DISH television system on August 8 in his Oakland home. 4-ER-680-689.

However, the disclosures discussed over the phone have no binding effect until the customer signs a "plan agreement." 3-ER-503-04 (72:18-73:22). DISH's standard subscription or "plan" agreements include the Digital Home Advantage

2

Plan ("DHAP") and the DISH Residential Customer Agreement ("RCA"), which is incorporated into all DISH plan agreements. 4-ER-561-64; 3-SER-583-85; 4-ER-577-592; 3-SER-587-600; 3-SER-577 (¶¶4-7). The DHAP is a form contract prepared solely by DISH and used to implement uniform terms of service across its customer base. 4-ER-716-18 (70:9-72:21); 3-ER-508 (110:11); 3-SER-577 (¶¶4, 7).

DISH's customers can cancel the installation and account without penalty at any time prior to installation. 3-ER-503-04 (72:24-73:24); 6-ER-1172 (14:14-15).

DISH requires a successful installation *before* the customer signs the DHAP. 4-ER-700-06 (19:8-15, 23:15-24:7, 26:10-28:10). Then the customer must sign the DHAP to receive DISH service. 4-ER-702-04 (24:10-26:6, 35:5-20); 4-ER-716-22 (70:9-72:21, 73:8-75:4, 79:10-24); 4-ER-724-25 (86:19-87:6). The DHAP must be signed "prior to the technician leaving the customer's home." 4-ER-719-21 (73:8-

3

75:4). DISH will not provide television services if the customer does not sign the

DHAP and agree to the RCA. 5-ER-849 (¶8); 5-ER-839 (5:24-26); 5-ER-875.[1]

## STATEMENT OF THE ISSUES ON CROSS-APPEAL

Whether based on the evidence before it, the district court correctly

concluded that there was no genuine dispute as to any material fact that the HSSA

applied to DISH's transaction with Fuentes, requiring that Fuentes' Motion for

Partial Summary Judgment as to his HSSA, UCL, and CLRA claims be granted in

part, and that DISH's Motion for Summary Judgment be correspondingly denied.

---

[1] The court did not rule on Fuentes' request for judicial notice of this last-cited evidence, which was a sworn declaration by DISH Vice-President Shannon Picchione that DISH filed in another case against it. 1-ER-19. In *Nordeman v. DISH Network LLC,* U.S. District Court for the Northern District of California, Case No. 3:21-cv-00923-TSH, DISH filed Picchione's declaration, stating "Satellite television services are not provided if the customer does not sign the [DHAP]." 5-ER-848 (¶8). This evidence qualifies as a party admission because DISH filed it in court. *E.g.*, *Hernandez v. Wells Fargo & Co.*, No. C 18-07354 WHA, 2019 WL 3017657, at *5 (N.D. Cal. July 10, 2019) ("admissions may be judicially noticed for the truth of the matter if requested by the opposing party"). Although the court stated it "cannot take judicial notice of disputed facts," it did not so hold, but instead ruled that DISH's objections were moot because the court "did not rely on the pleadings and declarations in the *Nordeman* case to resolve [DISH's summary judgment] motion." 1-ER-19.

## SUMMARY OF ARGUMENT
## IN OPPOSITION TO DISH'S CROSS-APPEAL

DISH's entire Home Solicitation Sales Act argument relies on the Court accepting that due to a California Legislative Counsel's opinion, California's HSSA categorically excludes "buyer-initiated contracts." This argument fails because the very opinion that DISH relies on expressly finds that the HSSA *does apply* to buyer-initiated contracts, as long as they are made away from "appropriate trade premises." Here, assuming, *arguendo*, that an oral contract was made on August 6, under California's *Traveler's* rule and consistent with the Counsel's opinion, any oral contract was consummated at Fuentes' home (away from appropriate trade premises), when he responded "yes" to "do you agree to all the terms and conditions I just read to you, Narciso?" 7-ER-1470. Because Fuentes accepted DISH's offer at home, the HSSA applies. *Travelers Ins. Co. v. Workmen's Compl. App. Bd*., 68 Cal. 2d 7, 14 (1967)

In addition, the district court ruled on the alternative ground, that "*if the Court accepts Fuentes' argument that the parties did not form a contract until the technician presented him with the tablet following installation*, Fuentes accepted the terms of that contract in his home, again placing it within the scope of the HSSA." 1-ER-21 (9:15-18) (emphasis added). DISH's brief does not address the counter-evidence presented to the district court that no binding contract was formed until Fuentes' signed DISH's forms at his home. At a minimum, the

5

contract signed at Fuentes' home served as modification of the oral contract, bringing it within the HSSA.

## ARGUMENT IN OPPOSITION TO DISH'S CROSS-APPEAL

1.     California's Home Solicitation Sales Act Applies to Contracts "Made" at Other than the Seller's Appropriate Trade Premises

California's Home Solicitation Sales Act, California Civil Code sections 1689.5, *et seq*. ("HSSA"), regulates the formation and performance of "home solicitation contracts or offers." The HSSA defines a "home solicitation contract or offer" in broad, plain, and simple terms: "*any contract*, whether single or multiple, or any offer which is subject to approval, for the sale, lease, or rental of goods or services or both, *made at other than appropriate trade premises* in an amount of twenty-five dollars ($25) or more, including any interest or service charges." Cal. Civ. Code §1689.5(a) (emphasis added).

The HSSA gives the consumer the right to cancel a home solicitation contract or offer until midnight of the third business day after the day on which the buyer signs the agreement. Cal. Civ. Code §§1689.6(a)(1), 1689.7(a)(1). The seller must also provide a completed form in duplicate captioned "Notice of Cancellation" in requisite form, which must be attached to the agreement and be easily detachable. *Id*. §1689.7(c).

In addition, per section 1689.7(a)(1) and (f), the entire agreement must be written and signed by the buyer in the same language, *e.g.*, Spanish, as principally

used in the oral sales presentation, and the consumer must be provided with a copy of the agreement, including the right to cancel.

If a seller fails to comply with any of these notice or formation requirements, the buyer retains the right to cancel the contract until the seller complies with the HSSA. Cal. Civ. Code §1689.7(g).

DISH does not contend that its contracts comply with the HSSA by including cancellation rights, being in Spanish, or in any other respect. The contracts do not. DISH instead bases its cross-appeal solely on the claim that an "oral contract" was formed that fell outside the HSSA because Fuentes initiated the August 6, 2015 call with DISH call center operator Nuñez. DISH assigns error to the court's ruling that there was no genuine issue of fact that Nuñez was the party offering terms that Fuentes accepted while in his home, rendering DISH's alleged "oral contract" "made" at his home, away from "appropriate trade premises." That ruling brought any "oral contract" within section 1689.5(a), thus rendering DISH liable under the HSSA, UCL, and CLRA. 1-ER-21 (9:10-18). The court ruled, alternatively, that if no oral contract was formed, then the DISH written contracts Fuentes signed at home two days after the call came within the HSSA, rendering DISH liable. *Id*.

7

a.   The District Court Correctly Determined that DISH Violated
the HSSA and, Consequently, the CLRA, and UCL

The court's order decided the underlying cross-motions on narrow grounds, without deciding whether an oral contract was formed over the telephone. The court held only that *assuming that an oral contract was formed*, it was not "made" at appropriate trade premises because Fuentes was indisputably the offeree and accepted at his home. 1-ER-21 (9:10-18).

Besides the fact that the district court did not state that an oral contract was formed, the court went on to consider the alternative that no oral contract was formed: "The outcome would be the same *if the Court accepts Fuentes' argument that the parties did not form a contract until the technician presented him with the tablet following installation*. Fuentes accepted the terms of that contract in his home, again placing it within the scope of the HSSA." 1-ER-21 (9:15-18), emphasis added. Under either alternative, as the court found, the HSSA applied to Fuentes' transaction and DISH violated the HSSA.

The court accordingly did not address most of Fuentes' counter-evidence, because even on DISH's own evidence and oral contract theory, the transcript of the telephone call established without doubt that Nuñez was the offeror and Fuentes was the offeree, with the result that any oral contract was made at Fuentes' home. The court found it unnecessary to address Fuentes' counter-evidence showing that no binding oral contract was ever made; that the parties did not enter

8

a contractual relationship until Fuentes signed DISH's written contract on the installer's "mobility device" at the time of installation; and that the written contract Fuentes signed contained numerous additional terms that Nuñez had not mentioned during the telephone call. (*See* pp. 24-29, below.)

> i. Section 1689.5(a) Is Clear and Unambiguous that the HSSA Applies to Buyer-Initiated Calls in Which the Seller Makes an Offer and the Buyer Accepts

DISH argues that section 1689.5(a) "is silent as to contracts made over the phone." (DISH's Brief at 26.) DISH maintains that the statute "does not resolve the question of how 'appropriate trade premises' relates to a telephone contract." (*Id*. at 30.)

To the contrary, the statute is not silent as to telephone contracts. It *does* resolve how "appropriate trade premises" relates to a telephone contract. The statute applies to all contracts "*made* at other than appropriate trade premises." The statute makes no special provision for telephone contracts. The place where a telephone contract is made is the same as where all other contracts are made—at the place where the offer is accepted. Because Fuentes accepted Nuñez's offer at home, the contract was "made" at his home.

Contrary to DISH's assertion otherwise, coverage under the HSSA does not depend on whether the buyer initiated the transaction, but on where the contract was made. *Louis Luskin & Sons, Inc. v. Samovitz*, 166 Cal. App. 3d 533, 536

(1985). "[T]he definition of the phrase 'home solicitation' in the statute focuses not on who initiated the contact between buyer and seller, but on where the contract was made." *Weatherall Aluminum Products Co. v. Scott,* 71 Cal. App. 3d 245, 248 (1977); *see also Williams v. Kapilow & Son, Inc.*, 105 Cal. App. 3d 156, 161 (1980) ("the emphasis of the statute was on the place at which the contract was made and not on whether contact was initiated by the buyer or the seller").

Solicitations made over the phone are covered by the HSSA. *People v. Toomey*, 157 Cal. App. 3d 1, 14 (1984) ("any contracts solicited over the telephone by Holiday must be deemed made at the buyers' home – where the offers were accepted"; "the same pressure to make an immediate decision arises from such solicitations, justifying the protection of the home solicitation sales act").

Before the summary judgment order, DISH saw no ambiguity, doubt, or "silence" in the statutory language as to the place a "telephone contract" is made or its relation to "appropriate trade premises." In its 2019 motion to dismiss, DISH was emphatic that the general rule stated in the *Travelers Insurance* case applies to telephone contracts:

> This [Legislative Counsel] analysis accords with both California and Colorado contract law: an oral contract completed over the phone is deemed "made" when and where the offeree accepts. *Travelers Ins. Co. v. Workman's Comp. App. Bd.*, 68 Cal. 2d 7, 14 (1967), *disapproved on other grounds*, *LeVesque v. Workmen's Comp. App. Bd.*, 1 Cal. 3d 627, 637 (1970)."

7 SER-495, 507 (7:3-6) (footnote omitted).

10

In denying DISH's 12(b)(6) motion as to the HSSA claim, the court agreed, and held that the *Travelers* rule applied to the telephone transaction in this case:

> Under California law, "an oral contract consummated over the telephone is deemed made where the offeree utters the words of acceptance." *Travelers Ins. Co. v. Workmen's Compl. App. Bd.*, 68 Cal. 2d 7, 14 (1967); *see also People v. Toomey,* 157 Cal. App. 3d 1, 14 (1984).

9 ER-1790, 1794 (5:7-10).

Even on summary judgment, DISH repeated its commitment to the *Travelers* rule: "Plaintiff concedes that a contract is formed where the offer is accepted…." 3-ER-370, 380 (7:20).

Assuming, *arguendo*, that a valid and binding oral contract was formed, the district court correctly found no genuine issue of fact that "it was Nuñez who provided Fuentes with the terms upon which Dish would offer him services. Therefore, the record supports the conclusion that Fuentes was the offeree. [fn] Because it is undisputed that Fuentes made the call from his home, it was not done at Dish's 'appropriate trade premises.'" (1-ER-13, at 9:10-15, footnote omitted.)

ii.   DISH Fails to Show Any Ambiguity in Section 1689.5(a);
      Indeed, Below DISH Asserted It Was Clear

Faced with a call transcript that unequivocally proves that Nuñez made the offer (4-ER-658-64; 4-ER-679-680), DISH urges this Court to interpret section 1689.5(a)  as providing that Fuentes, having initiated the telephone call, is

counterfactually the offeror, and the contract was therefore made at DISH's trade premises, where Nuñez was located.  (DISH'S Brief at 26-37.)

DISH acknowledges that the Court applies California statutory construction principles to the HSSA.  (DISH's Brief at 38.)  But by launching right into its argument based on the Legislative Counsel's opinion, DISH breaks California's first rule of statutory construction—the "plain meaning rule": "If the words [of the statute] themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs."  *Wells v. One2One Learning Foundation*, 39 Cal. 4th 1164, 1190 (2006).

"When statutory language is unambiguous, we must follow its plain meaning 'whatever may be thought of the wisdom, expediency, or policy of the act, even if it appears probable that a different object was in the mind of the legislature.'"  *In re D.B.,* 58 Cal. 4th 941, 948 (2014), quoting *People v. Weidert*, 39 Cal. 3d 836, 843 (1985).  "Because the language of these sections is unambiguous, we need not consider various extrinsic aids, such as the purpose of the statute, the evils to be remedied, the legislative history, public policy, or the statutory scheme encompassing the statute."  *Esberg v. Union Oil Co.*, 28 Cal. 4th 262, 269 (2002), superseded on other grounds, *Alch v. Superior Court*, 122 Cal. App. 4th 339, 396–397 (2004).

DISH has not shown that section 1689.5(a) is ambiguous in any respect. Below, DISH admitted that it was not.

iii.   The Legislative Counsel's Analysis Confirms the Correctness of the *Travelers* Rule that the Place Where the Offer is Accepted is the Place Where the Contract Is Made

The Legislative Counsel's analysis confirms the correctness of the summary judgment ruling by applying the *Travelers* place of making rule to telephone contracts, which DISH advocated and the court applied. If, as DISH asserts, "the Legislative Counsel analysis is the best available evidence with respect to the application of the HSSA to the facts presented here" (DISH's Brief at 30), then the *Travelers* rule necessarily applies to telephone contracts under the HSSA. The Legislative Counsel rejected the proposition DISH advances, that in enacting the HSSA the Legislature materially altered basic contract law such that whoever placed the call that led to a contract is the "offeror," no matter who proposes the underlying terms.

In issuing its advisory opinion, the Legislative Counsel was presented with specific sets of hypothetical facts, the first of which was:

> A homeowner telephones a seller at his place of trade or business to place an order for particular goods or services, and he instructs him to deliver the goods or services at a stated price of over $50 to the homeowner's residence. An oral contract is made.

6-ER-1198.

13

In analyzing this factual scenario, the Legislative Counsel applied the

*Travelers* rule:

> There is nothing in the above quoted provision, nor in any other provision of the bill which expressly makes provision for contracts made by telephone. However, under California law, it is a general rule of contract law that an oral contract consummated over the telephone is deemed made where the offeree utters the words of acceptance (*Travelers Ins. Co. v. Workmen's Comp. App, Bd.* (1967), 68 Cal. 2d 7, at 14).

6-ER-1199.

Applying the *Travelers* rule and the resulting finding that because the buyer

set the terms of the agreement (*i.e.*, offering "to buy particular goods at a specified

price, and thereafter instructing the seller to deliver such goods to his residence"),

"*the buyer would be the offeror in the transaction*. Thus, when the seller manifests

his assent *to the terms proposed by the buyer,* the contract would be made." 6-ER-

1199-1200, emphasis added.

As the uncontroverted record below makes clear, the opposite is true here.

After running a credit check on Fuentes, it was DISH that dictated the verbatim

terms of the "offer" (4-ER-658-64; 4-ER-679-680), which Fuentes agreed to.

Among other terms, the DISH representative set forth what "we are offering you

…" (4-ER-661), including "the Hopper equipment," (4-ER-662), "giving you a

card for $75 dollars," (*id.*), "giving you the installation for free," (*id.*), a "discount

for the whole year for $31.99 …", (*id.*), "a package with a lot of channels," (4-ER-

14

663), and "high definition, it's free for … it's free for life," (4-ER-664). After describing the terms of the programming offer to Fuentes, Nuñez provided Fuentes DISH's required disclosures. 4-ER-679-80. Ms. Nuñez then asked, "You would like to sign up at this time. Is that correct, Narciso?" and "do you agree to all the terms and conditions I just read to you, Narciso?" 4-ER-680. He indicated that he did. (*Id.*)

The court correctly concluded "the record supports the court's conclusion that undisputed evidence established that Fuentes was the offeree." 1-ER-13 (9:10-13). "Accordingly, Fuentes has demonstrated that his contract came within the scope of the HSSA, and [the court] GRANTS his motion and DENIES Dish's motion on this claim." 1-ER-13 (9:19-20).

To the extent that DISH claims that the Legislative Counsel opinion could be construed that buyer initiation of a phone call, standing alone, takes a contract out of the HSSA, that is undercut by the Legislative Counsel's discussion of Question No. 2. 6-ER-1200.

In this second hypothetical, the Legislative Counsel was presented with the same facts as the first hypothetical, except the seller does not maintain any "appropriate trade premises":

> A homeowner telephones a seller to place an order for particular goods or services, and he instructs him to deliver the goods or services at a stated price in excess of $50 to the homeowner's residence. An oral contract is made. The seller does not maintain premises at which

15

the owner or seller normally carries on a business or where goods are
normally offered or exposed for sale in the course of a business
carried on at those premises.

6-ER-1200.

In finding that "an oral contract made over the telephone between a

homeowner and a seller would be a home solicitation contract or offer,' and would

therefore be subject to the provisions of [the HSSA] …" the Counsel reasoned that

"[s]ince under the facts at hand that place would not be a place where the seller

normally carries on his business, nor where goods are normally offered or exposed

for sale, we think the place would not be an 'appropriate trade premises' as defined

by the bill … Thus, such contract would be within the definition of 'home

solicitation contract or offer' as defined by the bill."  6-ER-1201.

DISH's argument rests on the premise that "as the Legislative Counsel

analysis makes clear, the Legislature specifically excluded an entire category of

contracts from the scope of the HSSA—those initiated by a customer's inbound

call to a merchant's place of business …" (DISH's Brief at 40).  But the Legislative

Counsel expressly opined that the HSSA applies to contracts resulting from buyer-

initiated phone calls if they are made away from "appropriate trade premises."

   iv.   Case Law Refute Any Categorical Exclusion of Buyer-Initiated
         Contracts.

Consistent with this, California appellate decisions refute DISH's core

proposition that "the Legislature specifically excluded an entire category of

16

contracts from the scope of the HSSA—those initiated by a customer's inbound call to a merchant's place of business." *Weatherall,* 71 Cal. App. 3d at 247 (HSSA applied where "[buyer] telephoned [seller] who sent a representative to their home"); *Beley v. Mun. Ct.*, 100 Cal. App. 3d 5, 8 (1979) (affirming that the HSSA applies "to contracts entered in the home, even where the buyer had telephoned the seller and invited him to come to the home"); *Louis Luskin & Sons*, 166 Cal. App. 3d at 535 (finding HSSA application where the buyer "called a plumbing firm …, which dispatched a plumber to the premises that day"); *Williams*, 105 Cal. App. 3d at 161, ("a contract entered into at the buyer's home fell within the purview of the statute even though the buyer there had initiated negotiations by telephoning the seller and expressing an interest in his product").

DISH's citations to differently worded *non-California* home solicitation sales acts, do not help its position. (DISH's Brief at 35-36.) This is because the California Legislature rejected "buyer-initiated" statutory exclusions adopted in other states—notably Delaware. California adopted only one "buyer-initiated" exclusion, which is not applicable here. Cal. Civ. Code §1689.13. And more than 40 years of California authority reject DISH's restrictive interpretation of section 1689.5(a) . (*See* pp. 9-19, above.)

DISH focuses on Delaware's statute and the unpublished decision interpreting it, *Erhart v. DirecTV, Inc.*, 2012 WL 2367426, No. N10C09019 PLA

(Del. Super. June 20, 2012).  Unlike the California HSSA, the Delaware statute at issue in *Erhart* "excludes transactions in which 'the buyer has initiated the contact and the transaction is conducted and consummated entirely by mail or telephone' …." *Erhart*, 2012 WL 2367426, at *5 (applying exclusion "d"); 6 Del. Code §4403(3), subd. c, d, e (buyer-initiated exclusions).

California did not adopt that exclusion in enacting its HSSA.  The buyer-initiated exclusion provision of the California HSSA, section 1689.13, is restricted to three situations not applicable here.  Section 1689.13 not only distinguishes *Erhart*, but provides compelling confirmation that California does not "exclude[] an entire category of contracts from the scope of the HSSA—those initiated by a customer's inbound call to a merchant's place of business."  (DISH's Brief at 40.)

DISH ignores other states' HSSAs that, like California's, *do* cover "buyer-initiated" transactions. *See e.g., Morris v. Steffes Grp., Inc.*, 924 N.W.2d 491, 498 (Iowa 2019) (holding that under the Iowa Door-to-Door Sales Act, "the fact that a purchaser initiated conversations about a potential transaction does not necessarily take it outside the scope of the statute."); *Aluminum Shake Roofing, Inc. v. Hirayasu*, 110 Haw. 248, 253–54 (2006) (holding that the protections of Hawaii's door-to-door sales act "are not *automatically* suspended merely because the buyer initiated contact with the vendor") (emphasis in original); *Hollywood Decorators, Inc. v. Lancet*, 461 N.Y.S.2d 955, 956 (Sup. Ct. 1983) (applying New York's

"Door-to-Door Sales Protection Act" to transaction where "[i]n response to [seller's] radio advertisement [buyers] contacted the [seller] by telephone …").

Even in *Donaher v. Porcaro*, 47 Mass. App. Ct. 650 (1999), a case cited by DISH (DISH's Brief at 35), the Massachusetts appellate court noted that, under Massachusetts' "door to door sales act," as "currently written, initiation of the transaction of the buyer, without more, does not appear to avoid that statute's strictures." *Id*. at 653.

>     b.    DISH Fails to Address the Alternative Bases for Denying
>            DISH Summary Judgment that the Court Found
>            Unnecessary to Address After Ruling that DISH Was the
>            Offeror

DISH contends that if its claimed buyer-initiated contract theory applies, there is no alternative basis for affirming the summary judgment order. (DISH's Brief at pp. 42-46.) DISH argues that the agreement Nuñez had with Fuentes on the telephone must have resulted in a binding contract, even though DISH required Fuentes to sign its standard DHAP and RCA at his home to obtain service. (DISH's Brief at 42-35.)

Even assuming, *arguendo* and contrary to Fuentes' preceding points, DISH was correct that the HSSA generally excludes buyer-initiated telephone calls, notwithstanding the *Travelers* rule, DISH would still not be entitled to summary judgment. Fuentes' contrary evidence, at a minimum, raised genuine issues of fact

that precluded summary judgment in DISH's favor.  The court justifiably found it

unnecessary to consider this evidence; DISH unjustifiably ignores it.

> i.    The Right to Cancel the Installation Rendered any "Oral
>       Contract" Illusory

After a phone call at which an installation is scheduled, DISH's customers

can cancel the installation and the account without penalty at any time prior to

installation.  3-ER-503-04 (72:24-73:24); 6-ER-1172 (14:14-15).  The customer's

absolute right to cancel a supposed "oral contract" renders it illusory and not

"binding."[2]

> An agreement is illusory and there is no valid contract when one of
> the parties assumes no obligation, such as a contract in which
> performance is conditional on some fact or event that is wholly under
> the promisor's control and bringing it about is left wholly to the
> promisor's own will and discretion. For example, when one party to
> a contract reserves an absolute right to cancel or terminate
> the contract at any time, mutuality is absent, and the contract is void.

14 Cal. Jur. 3d Contracts §148; *see also Alameda Cty. v. Ross*, 32 Cal. App. 2d 135,

144 (1939) ("One of the commonest kind of promises too indefinite for legal

enforcement is where the promisor retains an unlimited right to decide later the

---

[2] DISH's reference to Colorado law regarding oral contract formation is a red
herring. (DISH's Brief at pp. 44-45). A Colorado choice-of-law provision was not
a term of the "oral contract" that DISH claims was made.  A telephone call with
one party in Emeryville, California, and the other in El Paso, Texas, regarding
television services that were to be provided in California would not be governed by
Colorado law without a choice-of-law provision, which was absent from the "oral
contract."

nature or extent of his performance. This unlimited choice in effect destroys the promise and makes it merely illusory.")

Because any telephone agreement was "illusory," no contract was "made" until Fuentes signed a DISH plan agreement at his home.

Further, California's Statute of Frauds renders any "oral contract" for 24 months of television service "invalid" and unenforceable. California Civil Code section 1624(a)(1) requires "[a]n agreement that by its terms is not to be performed within a year from the making thereof …" be "in writing and subscribed by the party to be charged or by the party's agent …" Cal. Civ. Code §1624(a)(1).

Under DISH's oral contract theory, Nuñez informed Fuentes that his subscription was for 24 months and included an early termination fee. 4-ER-680. Early termination is a breach of contract. DISH intends the early termination fee as a liquidated damages provision to compensate DISH for the customer's breach of contract if they terminate early. 3-ER-294-95 (31:20-32:6); 3-ER-305-12 (89:7-90:6; 95:15-96:11; 97:15-98:4). Therefore, any "oral agreement" reached could not have been *performed* in under a year and was "invalid" under section 1624(a). Even "an oral agreement to make a contract which must be in writing is itself within the statute of frauds." *Paul v. Layne & Bowler Corp.*, 9 Cal. 2d 561, 564 (1937).

Thus, even if there was an "oral contract," no binding contract could have been formed until Fuentes signed DISH's DHAP at his home.

ii.   There Was Ample Evidence Before the District Court that No Contract Was Formed Until Fuentes Signed DISH's Required Standard DHAP and Accepted Its RCA

Whether the bare agreement between Fuentes and Nuñez resulted in a binding contract depends on the intention of the parties:

> Where any of the terms are left for future determination and it is understood that the agreement is not to be deemed complete until they are settled, or where it is understood that the agreement is incomplete until reduced to writing and signed by the parties, no contract results until this is done.

1 B. WITKIN, SUMMARY OF CALIFORNIA LAW (2023) "Contracts" §134 [hereafter "WITKIN"]; RESTATEMENT (SECOND) OF CONTRACTS, §26, comment a [hereafter, "RESTATEMENT"] ("Conduct which resembles an offer may not be so intended either because there is an intent not to affect legal relations ….")

The DHAP and RCA are standard DISH contracts that DISH requires customers to agree to before providing television service.  4-ER-561-64; 4-ER-577-692; 3-SER-577 (¶¶4-7); 3-SER-587-600.  DISH will not provide television service if the customer does not sign the agreements. 5-ER-849 (¶8); 5-ER-839 (5:24-26); 5-ER-875.[3]  At the time of installation, a new customer must sign the

---

[3] *See* footnote 1, above, regarding the court's ruling on this evidence.

DHAP to receive service. 4-ER-702-04 (24:10-26:6, 35:5-20); 4-ER-716-22 (70:9-72:21, 73:8-75:4, 79:10-24); 4-ER-724-25 (86:19-87:6).

That DISH required Fuentes to sign the DHAP and agree to the RCA *as a condition of service*, is counter-evidence proving that DISH did not intend the phone conversation to be binding, precluding summary judgment in DISH's favor. DISH would not provide service based on the "oral contract" alone; signatures on the written contracts were essential to DISH's obligation to provide television service.

Further, that the DHAP and RCA contained numerous provisions Nuñez did not mention or explain during the telephone call (as will be shown in the next section) is additional, confirming, evidence that no contract was formed during the telephone conversation.

Recognizing this threat to its "oral contract" theory, DISH relies on the proposition that the "mere fact that a formal agreement to the same effect is to be prepared and signed does not alter the binding validity of [a prior binding] oral agreement." (DISH's Brief at 44-46, quoting *Columbia Pictures Corp. v. De Toth*, 87 Cal. App. 2d 620, 629 (1948).)

This abstract legal principle presumes the existence of a binding oral contract. "It is, of course, likewise the law that if it is the intention of the parties that before a contract shall exist between them, the terms of the contract are to be

23

reduced to writing and signed by them, a complete or binding contract does not arise until a writing evidencing the terms of the agreement has been executed." *Columbia Pictures,* 87 Cal. App. 2d at 629.

The intention of the parties controls whether they *did intend* to make an oral contract binding and whether they *did intend* a written contract merely to memorialize previously agreed terms. "Whether it was the mutual intention of the parties that the oral agreement should be binding *eo instante* is to be determined by the surrounding facts and circumstances of a particular case and is a question of fact for the trial court." 87 Cal. App. 2d at 629.

At a minimum, conflicting inferences regarding the parties' intentions preclude resolving contractual intent on summary judgment.

> Among the circumstances which may be helpful in determining whether a contract has been concluded are the following: *the extent to which express agreement has been reached on all the terms to be included*, *whether the contract is of a type usually put in writing*, *whether it needs a formal writing for its full expression*, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, *whether a standard form of contract is widely used in similar transactions*, and whether either party takes any action in preparation for performance during the negotiations. Such circumstances may be shown by oral testimony or by correspondence or other preliminary or partially complete writings.

RESTATEMENT, §27, emphasis added.

Here, the DHAP and the lengthy and detailed RCA it incorporated contained terms that Nuñez had not presented and to which Fuentes had not agreed, showing

24

that express agreement on all terms was not reached during the phone call. DISH's subscription agreements required "a formal writing for [their] full expression" and reflected "standard form of contract[s] widely used in similar transactions." DISH allowed customers to cancel before installation and would not honor any "oral subscription contract" alone, requiring that the customer first sign the DHAP as a condition of service.

This evidence precluded summary judgment on the intention of the parties to form an "oral contract" and to relegate the DHAP and the RCA to mere "confirmatory" status.

> iii. There Was Ample Evidence Before the District Court that the DHAP DISH Required Fuentes to Sign Contained Additional Terms that at a Minimum Modified the "Oral Contract" and Brought it Within the HSSA

DISH's standard DHAP and its incorporated RCA terms contain numerous additional material terms that Nuñez did not mention or explain during the August call. Some RCA terms actually contradict what Nuñez said, particularly with respect to the 12-month $19.99 price guarantee. 4-ER-679-80. The numerous additional terms DISH included in the DHAP and the RCA that Nuñez did not mention or explain during call raise the inference that DISH did not intend the phone call to create a binding contract:

25

| DHAP/RCA Provision | Section in Customer Agreements (DHAP (4-ER-561-64) and RCA (3-SER-587-600)) | Discussed and/or agreed during August 8, 2015 service arrangement call (4-ER-656) |
|---|---|---|
| Incorporation of the RCA by reference in the DHAP | DHAP p. 1 | No |
| Mandatory binding arbitration | DHAP p. 1 | No |
| DISH's right to change pricing and programming unilaterally and without notice during the term commitment | DHAP p. 1; RCA §4(H) | No; during the call, Fuentes was promised a one-year price guarantee of $19.99 per month on the DISH Latino program package (4-ER-679) |
| Customer's consent to autodialing calls and prerecorded messages on all telephones, including cellphones | DHAP p. 3; RCA §13(C) | No |
| DISH's right to change any terms of service unilaterally and without notice | RCA §2, 13(L) | No |
| DISH's right to change minimum programming requirements unilaterally without notice | RCA §4(B) | No |
| DISH's right to require prepayment if the account becomes past due | RCA §5(D) | No |
| DISH's right to change software, features, and functionality unilaterally and without notice | RCA §7(F) | No |

| DHAP/RCA Provision | Section in Customer Agreements (DHAP (4-ER-561-64) and RCA (3-SER-587-600)) | Discussed and/or agreed during August 8, 2015 service arrangement call (4-ER-656) |
|---|---|---|
| Restriction on customer's transfer of services and equipment | RCA §9 | No |
| Limitations on DISH's liability | RCA §10(A)-(F) | No |
| Mandatory binding arbitration provisions | RCA §12 | No |
| DISH's right to give customer notice in a bill insert, via broadcast on a television channel, or on DISH websites | RCA §13(A) | No |
| Customer's authorization to DISH to make credit checks, including pulling customer's credit reports | RCA §13(F) | No |
| Application of Colorado law | RCA §13(G) | No |
| Anti-waiver provision in DISH's favor | RCA §13(I) | No |
| Customer's commitment to comply with all DISH "policies" | RCA §13(K) | No |
| DISH's unilateral right to make a final determination of any ambiguity in the language of the customer agreements | RCA §13(L) | No |

| DHAP/RCA Provision | Section in Customer Agreements (DHAP (4-ER-561-64) and RCA (3-SER-587-600)) | Discussed and/or agreed during August 8, 2015 service arrangement call (4-ER-656) |
|---|---|---|
| Customer agreement to DISH fee schedule, including "transactional fees" | RCA Exhibit 1 | No |

*Columbia Pictures*, and its progeny, require that the "parties orally agree upon *all of the terms and conditions of an agreement*" and "contemplate a later "formal written agreement *to the same effect*." 87 Cal. App. 2d at 629 (emphasis added.) Because Nuñez did not mention or explain many important terms of the DHAP and the RCA during the telephone call, the trier of fact could find (a) that DISH did not intend the oral conversation to form an oral contract, and (b) that the DHAP Fuentes signed was not merely confirmatory of any prior oral contract. This precludes summary judgment in DISH's favor on its *Columbia Pictures* theory.

DISH attempts to save its *Columbia Pictures* theory by claiming "standard terms." (DISH's Brief at pp. 45-46.) But there was no mention during the phone call of any "standard terms," nor is there any evidence that Fuentes knew anything about "standard terms" that might apply to the transaction.

28

*Columbia Pictures* does not hold that one party's standard terms are automatically incorporated, sight unseen by the other.[4]  In *Columbia Pictures*, the Court of Appeal merely affirmed the trial court's findings under the substantial evidence rule based on the evidence at trial.  *Columbia Pictures,* 87 Cal. App. 2d at 629.

There, the defendant's agent orally negotiated a contract with Columbia for defendant to direct a movie.  *Id*. at 625.  The agent was an "experienced motion picture agent" and "familiar with the standard form of director's contract used by Columbia."  *Id*. at 629-30.  The court held that the defendant was bound by the agent's actual knowledge of Columbia's standard terms.  *Id*. at 630-31.  Here, by contrast, there is no evidence that Fuentes knew DISH's standard terms at the time the "oral contract" was allegedly made.

The vast differences between the terms Nuñez presented on August 6 and the contract terms presented to Fuentes on August 8 negate that any contract was formed on August 6.  And if an oral contract was formed on August 6, DISH modified it with its standard written terms on August 8.  As the court found, Fuentes' signature on these standard written terms brought the DHAP squarely within section 1689.5(a) .

---

[4]  In *Nat'l Controls v. Commodore Bus. Machs.*, 163 Cal. App. 3d 688, 693 (1985), the court based its ruling on Commercial Code §2207(2), which only applies "between merchants" and not to consumer contracts.

2.  DISH Does Not Dispute That Its Contracts Violate the HSSA's Requirements

As the court found (and DISH does not now contest): "It is undisputed that Fuentes' DHAP and RCA did not comply with the HSSA, which requires that a contract falling within its scope include information about a buyer's right to cancel and be written in the same language as an oral sales presentation. See Cal. Civ. Code §§1689.6(a)(1), 1689.7(a)(1)(c). 'Until the seller has complied with this section the buyer may cancel the home solicitation contract or offer.' *Id.* §1689.7(g)." 1-ER-13 (8:10-14).

DISH does not contend that its contracts comply with the HSSA, and DISH makes no argument that the court erred in ruling that they do not.

3.  DISH's HSSA Violations Serve as Predicate Violations of the UCL and the CLRA

Because the district court correctly found that DISH violated the HSSA, it also correctly ruled that DISH's HSSA violation served as predicate violations of the UCL and the CLRA.  With respect to the UCL claim, the court correctly found that "Because the Court has found in favor of Fuentes on the HSSA claim and on the CLRA claim, in part, he too is entitled to judgment, in part, in his favor on this claim." 1-ER-29 (17:23-24). The court also correctly found that DISH violated subsection (a)(14) of section 1770 of the Consumers Legal Remedies Act "because

it represented his contract was final and binding when, in fact, he had the right to cancel under the HSSA." 1-ER-13 (15:11-12).

DISH does not contest these rulings. Its sole basis for contesting UCL and CLRA liability is that it did not violate the HSSA. (DISH's Brief at 42.)

4.      DISH's "Absurd Result" Argument Is Without Merit

In its summary judgment order, the court merely applied the *Travelers* rule to the facts of the case and found that the HSSA applied. 1-ER-21. Despite its earlier advocacy that the *Travelers* rule applies to section 1689.5(a) , DISH now argues "absurd results" to avoid the consequences of applying the *Travelers* rule. (DISH Brief at 37-40.)

DISH fails to meet the extremely high bar set by the California courts. Courts will only apply the absurdity doctrine "most sparingly and only in extreme cases"; more than potentially "troubling consequences" need to be shown:

> [T]he absurdity exception requires much more than showing that troubling consequences may potentially result if the statute's plain meaning were followed or that a different approach would have been wiser or better. [Citations.] … Moreover, our courts have wisely cautioned that the absurdity exception to the plain meaning rule 'should be used most sparingly by the judiciary and only in extreme cases else we violate the separation of powers principle of government.'" (*Switzer v. Wood* (2019) 35 Cal.App.5th 116, 129 [247 Cal. Rptr. 3d 114].)

*People v. Heard*, 83 Cal. App. 5th 608, 625-26 (2022); *accord*, *King v. Pac. Gas & Elec. Co.*, 82 Cal. App. 5th 440, 451 (2022), citing and quoting *Myers v. Superior Court*, 78 Cal. App. 5th 1127, 1137 (2022).

Contrary to DISH's suggestion otherwise, the *Joseph v. J.J. Mac Intyre Companies, L.L.C.*, 238 F. Supp. 2d 1158 (N.D. Cal. 2002) decision does not hold that courts have carte blanche authority to ignore statutory language. (DISH's Brief at 39). The court's analysis in *Joseph* was based primarily on "[t]he statutory context of the sentence relied upon by Plaintiff." *Id*. at 1164–65. The court interpreted statutory language in its context and did not apply the absurdity doctrine.

DISH claims that the court's straightforward ruling will "upend[] the settled expectations of all California merchants doing business over the phone." (DISH's Brief at 37-40.) DISH warns that the court's "absurd result" will throw small pizza parlors and flower shops into disarray, and snarl online sales. (*Id*.)

DISH's "parade of horribles" is speculative and unfounded. Pizza and flower shops are not before the Court, nor is there any online sale transaction.[5]

---

[5] It is doubtful that food is even a "good" covered by the HSSA. "'Goods' means tangible *chattels* bought for use primarily for personal, family, or household purposes …." Cal. Civ. Code, §1689.5(c), emphasis added.

DISH's argument does not warrant the courts in overriding the California Legislature and its 40-year-old HSSA on the clear set of facts before the Court, which establish that DISH violated the HSSA.

Simple advertised or posted prices present a fundamentally different contract formation analysis from here, where DISH required the lengthy bilateral contract provisions embodied in the DHAP and lengthy RCA. Advertisements are not typically treated as offers, but merely as invitations to bargain. *Harris v. Time, Inc.*, 191 Cal. App. 3d 449, 455 (1987); *see also Roley v. Google LLC*, 40 F.4th 903, 909 (9th Cir. 2022) ("[a]dvertisements are not typically understood as offers").

An exception to this rule is that "an advertisement can constitute an offer, and form the basis of a unilateral contract, if it calls for performance of a specific act without further communication and leaves nothing for further negotiation." *Harris,* 191 Cal. App. 3d at 455; *see also Donovan v. Rrl Corp.*, 26 Cal. 4th 261, 271-72 (2001).

Even where the unilateral contract exception has been applied, the contract is accepted by the offeree's performance, not by a promise. WITKIN, "Contracts" §105 ("A unilateral contract is one in which a promise is given in exchange for some act, forbearance or thing; there is only one promisor"). That is what

distinguishes a unilateral from a bilateral contract, where acceptance is made by a counter promise. *Id*.

In the case of an advertised price that qualifies within the unilateral contract exception, the consumer "accepts" the contract by making payment, either at the time of the order or at the merchant's place of business. In either case, payment is the act of acceptance and it is made where the money is actually *received*, at the merchant's trade premises. Until the consumer accepts by paying, there is no contract. WITKIN, "Contracts" §75 ("The place of contracting is the place where the last act is done that is necessary to give a contract binding effect", quoting Rest.2d, Conflict of Laws §188(2)(a), comment e).)

In sum, whether the HSSA applies to simple product purchases requires an entirely different contract formation analysis from this case. *Cal. Teachers Ass'n v. Governing Bd. of Rialto Unified Sch. Dist.*, 14 Cal. 4th 627, 644 (1997) ("We find these [absurd construction] claims to be exaggerated and unrealistic for the simple reason that the District's premise, namely, that our interpretation of section 44919(b) will require it to hire unqualified athletic coaches, is patently incorrect").

Even if some telephone flower order could be considered a bilateral contract made at the customer's home, according to DISH applying the HSSA would be an *intended*, not an *absurd*, result. The Legislative Counsel's opinion applied the *Travelers* place of making rule. DISH advocated applying the *Travelers* rule, and

34

still holds the Legislative Counsel's opinion up as definitively expressing

legislative intent.  If, as DISH has so consistently argued, that opinion expresses

the intent of the Legislature, the results that follow from the *Travelers* rule cannot

be considered absurd.

If the Legislature becomes dissatisfied with that intention, it is for the

California Legislature, not this Court, to pass the necessary legislative

amendments.

DISH states that it "considered the statute and reasonably determined that it

does not apply to the situation presented here."  (DISH's Brief at pp. 40-42.)  DISH

cites no authority to support that a party's subjective interpretation of a statute

overrides statutory language.  Ignorance of the law is no defense. Further, DISH

conducted its internal analysis in *June 2016*, after this case was filed.  2-ER-151.

DISH's post-litigation "analysis" is self-serving, does not change the law, and

disregards the ample, binding California precedent rejecting its position.  (*See* pp.

9-19, above.)

## LEGAL ARGUMENT IN SUPPORT OF FUENTES' PRINCIPAL BRIEF

1.     Section 1447(c) Required the District Court to Remand the
       Claims to the Extent they Requested Public Injunctive Relief

DISH contests that the remand statute required the district court to remand

the part of the case over which the court indisputably lacked subject matter

jurisdiction.  (DISH's Brief at pp. 48, 64-65.)  The statute provides that "If at any

35

time before final judgment it appears that the district court lacks subject matter jurisdiction, *the case* shall be remanded." 28 U.S.C. §1447(c) (emphasis added).

Under the statute, as judicially interpreted, if a federal court has subject matter jurisdiction over any part of a removed case, it has removal jurisdiction and cannot remand the *entire* case. *Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1004 (9th Cir. 2001); *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 386 (1998).

That undisputed principle does not resolve whether under §1447(c), *after* a district court has adjudicated everything over which it has jurisdiction, it must remand the remainder, over which it has no jurisdiction. (Fuentes' Opening Brief ("Fuentes Brief") at pp. 18-20.) The statutory language supports the interpretation that the answer is yes: having adjudicated all the claims, the only "case" that remains is the part the court lacks constitutional power to adjudicate. That "case" must be remanded under §1447(c) .

*Lee* agreed, stating "A case that is properly removed in its entirety may nonetheless be effectively split up when it is subsequently determined that some claims cannot be adjudicated in federal court." 260 F.3d at 1007. The panel seemed to recognize that by removing, the defendant is the party responsible for bringing extra-jurisdictional claims into the federal courts in the first place; so it is reasonable to interpret §1447(c)  as requiring federal courts to put the parties back

in the position they were at the time of removal, by remanding the parts of cases the Constitution has placed beyond the reach of the federal courts.

DISH correctly observes that, strictly speaking, *Lee* only denied remand of the entire case. But *Lee*'s endorsement of remanding claims beyond the court's jurisdiction planted a judicial signpost for the later judicial interpretation of §1447(c) .

*Magadia v. Wal-Mart Assocs., Inc.*, 999 F.3d 668 (9th Cir. 2021) saw *Lee*'s signpost and followed its direction. The Court squarely addressed whether the plaintiff had Article III standing to bring claims under PAGA,[6] held that he did not, and ordered mandatory remand of the PAGA claim, citing *Lee*:

> As a result, we hold that Magadia lacks standing to bring a PAGA claim for Walmart's meal-break violations since he himself did not suffer injury. We remand Magadia's meal-break claim to the district court *with instructions to return it to state court*. *See Lee*, 260 F.3d at 1008.

999 F.3d at 678, emphasis added.

The Court did not engage in "any unstated assumptions on non-litigated issues" that would deprive this clear holding of precedential value. (DISH's Brief at p. 64.) This Court should adhere to *Magadia* and hold that once the district court had adjudicated all claims within its subject matter jurisdiction, section

---

[6] Private Attorneys General Act, Cal. Labor Code §§2698, *et seq.*

1447(c)  required it to remand the remaining claims, beyond its jurisdiction, to state court.

*Magadia* did not remand to the district court to exercise *discretion* whether to dismiss.  Therefore, DISH's request that this Court remand to permit the district court "discretion" to dismiss, is unsupported.  (DISH's Brief at pp. 72-73.)  That the defect here is jurisdictional, to which §1447(c)  applies, distinguishes the cases DISH cites there.  (Fuentes Brief at pp. 21-24.)

DISH renews its argument that once a class action case is removed under CAFA, *statutory* jurisdiction under CAFA does not lapse due to later developments, particularly the denial of class certification.  (DISH's Brief at pp. 48-49.)  But the continuation of statutory jurisdiction cannot confer Article III jurisdiction where none exists.  (Fuentes Brief at p. 32.)  *Magadia* was removed under CAFA (*Magadia*, 999 F.3d at 673), but that did not prevent the Court from ordering remand of the extra-jurisdictional claims.

2.    DISH's Arguments Against Remand Based on its "Claim Versus Remedy" Distinction and "Claim Splitting" Lack Merit

DISH objects to following *Lee* and *Magadia* on the ground that those cases only addressed whether "a claim (not part of a claim) may be remanded."  (DISH's Brief at pp. 64-65.)  DISH argues that "having jurisdiction over all of the claims that Fuentes alleged, the district court then disposed of them."  (DISH's Brief at p.

38

49.)  DISH argues that in its summary judgment order, the court "adjudicated" the "*claims*" under the UCL and CLRA.  (*Id*. at p. 50 (emphasis in original).)

DISH rests this on two different arguments.  DISH first argues that for purposes of remand, a "claim" is distinct from the remedies sought: when a court only partially adjudicates a claim, leaving a remedy unadjudicated, that is still an adjudication of the claim; the now-detached *remedy* cannot be remanded because the *claim* has been adjudicated.  (DISH's Brief at pp. 49-53.)  Second, DISH argues that, even if the remedy remains part of the claim after partial adjudication, the partial adjudication results in impermissible "claim splitting," barring remand.  (*Id*. at pp. 53-57.)

Fuentes replies to these two arguments in order.

a.    The District Court Did Not Adjudicate, Address, or "Dispose" of Fuentes' Claims to the Extent They Requested Public Injunctive Relief

DISH argues that by partially adjudicating the HSSA claim in Fuentes' favor on summary judgment (and the CLRA and UCL claims in part to the extent they were based on or derivative of the HSSA claim), the district court nevertheless "adjudicated" those "claims."  (DISH's Brief at pp. 49-50.)  DISH concludes that the only thing left was a bare, untethered "remedy"—public injunctive relief, thereby depriving the court of its power to remand under *Lee* and *Magadia*.  (*Id*. at 50-53.)

i. The District Court's Summary Judgment Order Left Unadjudicated *Claims* to Remand

DISH argues that "[t]he district court was correct" in ruling that there were "no unadjudicated claims to remand." (DISH's Brief at 51.) DISH does not dispute that the court accepted DISH's request *not* to rule on anything other than "Fuentes' transaction with Dish." (Fuentes Brief at pp. 24-26.) The court expressly did not address the merits of public injunctive relief on summary judgment.

ii. The Federal Rules of Civil Procedure Treat Each Remedy as an Integral Part of a "Claim"

DISH's response that under Rule 8(a), multiple remedies do not create multiple claims, misses the point. (DISH's Brief at pp. 52-53.) Rule 8(a) provides that *each remedy* is part of the *same claim*. In DISH's example, a breach of contract claim, a party may seek both damages and injunctive relief; Rule 8(a) provides that both remedies are part of the contract claim. If a court partially adjudicates one of those remedies, what remains is not a bare remedy but a claim including the remaining remedy.

Mirroring Rule 8(a)'s fusion of remedy with claim, Rule 56(a) treats all aspects of a claim as included within it, including remedies. "A party may move for summary judgment, identifying each claim or defense — *or the part of each claim or defense* — on which summary judgment is sought." (Emphasis added.)

40

Any aspect of either liability or remedy can be summarily adjudicated, leaving the remainder of the claim intact for trial, or remand for lack of jurisdiction. Rule 56(g) provides that "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — *including an item of damages or other relief* — that is not genuinely in dispute and treating the fact as established in the case." (Emphasis added.)

A partial summary adjudication of one remedy on the same claim does not foreclose a trial of an unadjudicated remedy on the same claim. *Geneva Int'l Corp. v. Petrof, Spol, S.R.O.*, 608 F. Supp. 2d 993, 1004-05 (N.D. Ill. 2009) ("The purpose of [Rule 56(g)] is twofold: to salvage some of the judicial effort involved in the denial of a motion for summary judgment and to streamline the litigation process *by narrowing the triable issues*," quoting *Republic Tobacco, L.P. v. North Atlantic Trading Co., Inc.,* 254 F. Supp. 2d 985, 997 n. 13 (N.D. Ill. 2002) (emphasis added); *D'Iorio v. Winebow, Inc.*, 68 F. Supp. 3d 334, 356 (E.D.N.Y. 2014) ("Rule 56(g) allows a court to grant partial summary judgment, thereby reducing the number of facts at issue in a trial.")

Fuentes' claims for public injunctive relief were not bare requests for injunction. (DISH's Brief at 51 ([a]n injunction is a remedy, not a claim".) He supported them with allegations of the complaint alleging violations of the HSSA, UCL, and CLRA. 8-ER-1770-73 (¶¶61-67); 1771-77 (¶¶71-86) 1779 (¶¶92-93);

1781-82 (¶99). Fuentes alleged that these allegations established liability on his claim, but the district court never addressed those allegations. (Fuentes Brief at pp. 24-27.)

### iii. The Federal Courts' "Unflagging Obligation" to Adjudicate All Controversies Within Their Subject Matter Jurisdiction Negates DISH's "Claim" Versus "Remedy" Distinction

DISH cannot cite a single federal appellate decision applying §1447(c) supporting its "claim" versus "remedy" argument.[7] (DISH's Brief at pp. 49-53.) If its claim versus remedy distinction were sound, a district court would be free to pick and choose which remedies to adjudicate. A court could simply foreclose remedies it did not want to grant by entering summary judgment or judgment on a claim as to one of two requested remedies, without addressing the other.

But that is contrary to law. The federal courts have a "virtually unflagging obligation" to adjudicate controversies placed before them:

> In general, abstention from the exercise of federal jurisdiction is considered "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River*, 424 U.S. at 813, *quoting County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188, 3 L. Ed. 2d 1163, 79 S. Ct. 1060 (1959). *Federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them." Colorado River*, 424 U.S. at 817.

---

[7] DISH cites only the district court decisions of *Cabral* and its progeny elsewhere in its brief. (DISH's Brief at pp. 55-57.) Fuentes addressed these cases in his opening brief and comments again briefly on them below. (Fuentes Brief at pp. 32-38.)

*Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253, 1256-57 (9th Cir. 1988), citing and quoting *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817-18 (1976) (emphasis added).

The Ninth Circuit has just reaffirmed this "unflagging obligation." In *Ernest Bock, LLC v. Steelman*, 76 F.4th 827 (9th Cir. 2023), the Court held that a district court's stay of a federal case in favor of pending state court litigation was impermissible because state case would not necessarily resolve the federal litigation:

> The Supreme Court has made clear that a *Colorado River* stay [of a federal case pending a state case] is proper only in "exceptional circumstances." *Id.* at 813. Absent such circumstances, federal courts have a "virtually unflagging obligation … to exercise the jurisdiction given them." *Id.* at 817. "Thus, the decision to invoke *Colorado River* necessarily contemplates that the federal court will have *nothing further to do* in resolving any substantive part of the case." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.* (*Moses Cone*), 460 U.S. 1, 28, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983) (emphasis added).

*Id*. at 832 (emphasis added).

DISH's "claim" versus "remedy" argument would enable district courts to impermissibly abstain from addressing remedies before them by simply "pocketing" a ruling on remedy.  Here, the district court still had "something further to do" after summary judgment—either to adjudicate the public injunctive relief claims or, because it lacked jurisdiction, remand them to state court.

iv. The Remedy-By-Remedy Standard for Article III Standing
        Negates DISH's "Claim" Versus "Remedy" Distinction

DISH does not dispute that the Supreme Court has mandated a discrete
remedy-by-remedy standard for Article III standing, not a claim-by-claim standard.
(Fuentes Brief at pp. 16-17.) "[S]tanding is not dispensed in gross; rather,
plaintiffs must demonstrate standing for each claim that they press and for each
form of relief that they seek (for example, injunctive relief and damages)."
*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

Nor does DISH dispute that a federal court lacks power to rule on the merits
of a remedy beyond its jurisdiction, such as public injunctive relief here. (Fuentes
Brief at p. 19.) DISH instead argues that "performing that standing analysis for
each remedy does not mean, as Fuentes suggests, that each remedy gives rise to a
separate claim." (DISH's Brief at pp. 58-59.) Fuentes does not suggest that. He
states that the remedy-by-remedy standard requires a district court to remand *a
single claim* to the extent it lacks jurisdiction over a remedy.

For the district court's summary judgment order to have "left no
unadjudicated claims to remand" would create the anomalous and contradictory
result that the court could both determine that it lacked jurisdiction over a remedy
and still *dispose* of that remedy on the merits. This turns *TransUnion* on its head
by arming a remedy-by-remedy standard intended to strictly *limit* Article III
jurisdiction to empower federal courts *sub silentio* to dispose of remedies beyond

44

their jurisdiction.  That is not a power that a court's "unflagging obligation to exercise its jurisdiction" allows it over remedies *within* its jurisdiction.

DISH urges exactly that result here.  By entering judgment providing that "no injunctive relief shall issue," "the district court fully adjudicated all claims, *including the CLRA and UCL claims [Fuentes] asks the Court to remand.*"[8] (DISH's Brief at p. 49 (emphasis added); 1-ER-3 (¶8).)  In other words, the court transformed the remedy-by-remedy restriction on its jurisdiction into a sword for adjudicating remedies beyond its jurisdiction.

> v.  *Vaughn v. Tesla* Does Not Support the Denial of Fuentes' Remand Motion

DISH agrees with Fuentes that under *Vaughn v. Tesla, Inc.,* 87 Cal. App. 5th 208, 236-37 (2023), Fuentes' request for public injunction is part of his *individual* claims under the UCL and the CLRA.  (DISH's Brief at pp. 51-52.)  So the district court's quotation from *Vaughn* (1-ER-5) means only that remedies personal to Fuentes (such as the monetary recovery awarded him under the judgment) and public injunctive relief are dual remedies on the same UCL and CLRA claims.

---

[8] DISH omits to clarify that the court based its denial of injunctive relief was on its remand order.  The Court expressly entered Judgment "PURSUANT TO THE PARTIES' STIPULATION AND THE COURT'S ORDERS ON SUMMARY ADJUDICATION DATED NOVEMBER 15, 2022 AND REMAND DATED MAY 17, 2023." 1-ER-2 (capitals in original).

Being only dual remedies on a single claim, the public injunction aspect of the claims should be remanded for the reasons stated above.

> b.     DISH's Claim Splitting Argument Is Without Merit

Fuentes next turns to address the second prong of DISH's "full disposition" argument, that even if what Fuentes moved to remand *were* "claims" and not just disembodied remedies, Article III jurisdictional limitations result in impermissible claim splitting between public injunctive relief and other relief, barring remand.

The power and duty of federal courts to remand under §1447(c) depends on federal constitutional and statutory law, not on non-constitutional state (or even federal) "claim splitting" principles. The cases DISH cites on claim splitting fail to explain how common law claim splitting principles intended to prevent duplicative litigation are in any way tied to §1447(c) or Article III. (DISH's Brief at pp. 53-57.)

> i.     DISH Does Not Dispute that for Claim Preclusion, "Claim Splitting" Only Applies in *Serial* or *Successive* Lawsuits, Which Are Absent Here

Rules against claim splitting have no bearing on the question of remand under §1447(c). Claim splitting *precludes* claims only when there is a *prior judgment* on claims raised in a *successive* lawsuit. (Fuentes Brief at pp. 34-35.)

Claim preclusion only applies when there are successive lawsuits on the same claims or "primary rights."[9]  At the time of the remand motion and judgment, no serial or successive lawsuit was pending, nor is any now.

Fuentes acknowledges that the remedy-by-remedy standard results in splitting the UCL and CLRA claims on remand.  But the preclusive effect, if any, of that result is for the state court to decide on remand, with the public injunctive relief claims before it, not a federal court without jurisdiction.  Claim preclusion requires that a final judgment be entered in the first action.  WITKIN, CALIFORNIA PROCEDURE, "Judgment" §390 (2023).  The bar of the prior judgment is an affirmative defense in the successive lawsuit.  *Hulsey v. Koehler*, 218 Cal. App. 3d 1150, 1158 (1990) ("a rule against splitting of actions is for the benefit of the defendant and is waived by the failure to specifically plead the defense.")

The state court can hear DISH's "primary rights" arguments on remand.  For Fuentes' part, the district court's lack of subject matter jurisdiction excludes the judgment in this case from the application of claim splitting rules.  (Fuentes Brief at pp. 35-36.)  DISH does not contest the jurisdictional exception to claim splitting.

---

[9]  California claim preclusion law provides that a plaintiff who "splits a cause of action" between two different actions is deemed to have "merged" that cause of action in the first judgment and cannot bring it again in a later action.  WITKIN, CALIFORNIA PROCEDURE, "Judgment" §435 (2023) ("A long-established rule prohibits the splitting of a single cause of action so as to permit successive actions on parts of the claim").

For a district court, as here, to apply claim preclusion in advance of any judgment is not only impermissibly anticipatory, but also in excess of Article III jurisdiction.  Until the public injunction claims are remanded, there is no "prior judgment" for any court to assess.  And federal court application of claim splitting rules is in excess of Article III subject matter jurisdiction because DISH would have to present claim preclusion as a merits defense to the public injunction claims.

ii.  DISH's New Argument Based on Claim Splitting in *Simultaneous* Litigation Is Without Merit

Instead of contesting Fuentes' argument based on claim preclusion, DISH sidesteps it, now arguing that Fuentes has "confuse[d] claim splitting with the related, but distinct, doctrine of claim preclusion."  (DISH's Brief at p. 59.)  DISH argues that unlike "claim preclusion," "claim splitting applies to *simultaneous parallel* litigation."  (*Id*., emphasis added.)

Below, DISH did not argue that claim splitting applied to "simultaneous parallel litigation."  Its argument below—that "[a]djudicating one part of Plaintiff's claim on summary judgment, and remanding the remaining part to state court, is the definition of claim-spitting"—addressed only successive litigation after remand.

Apparently recognizing this fault in its argument below, DISH now attempts to distance itself from "claim preclusion," arguing that claim splitting applies

48

independently of claim preclusion when there is "simultaneous parallel litigation." (DISH's Brief at pp. 59-60.)

DISH is correct that federal courts may apply "claim splitting" to "simultaneous parallel litigation." That only happens when two cases are pending in the same federal court at the same time. Federal courts may then utilize claim splitting analysis in considering *discretionary* orders to dismiss one of the cases as long as the plaintiff is still able to pursue all claims in the remaining case. Courts then apply the same claim preclusion standards as in successive litigation cases, the only difference being not requiring a prior judgment. But these standards include the same lack of jurisdiction exception to concurrent cases as applies where there has been a prior judgment. (Fuentes Brief at pp. 35-36.)

DISH's claim splitting argument does not fare any better under discretionary dismissal standards that may apply to concurrent cases. First, there has been no "concurrent parallel litigation" since DISH removed. And there will be no "simultaneous parallel [state court] litigation" upon remand of the public injunction claims upon a final judgment *concluding the federal case*.

Second, a federal court can only order a discretionary dismissal if the remaining case is pending in the same federal court and all claims can be pursued in that case:

> In federal court, discretionary dismissals have been granted where there are *two pending cases in the same court* on the same claims, and the *plaintiff can still pursue all of its claims on one or other of the cases*.

*Adams v. Cal. Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007) (emphasis added) (affirmed based on abuse of discretion standard of review).

In determining whether such suits are duplicative, the courts "borrow from the test for claim preclusion." *Id*. As the italicized language in the preceding quote from *Adams* makes clear, the borrowed claim preclusion principles include lack of jurisdiction precluding the plaintiff from proceeding in one of the cases, the exception to claim splitting Fuentes discussed in his opening brief. (Fuentes Brief at pp. 35-36.)

The other cases DISH cites are no different.[10] *Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879 (9th Cir. 2022) applied "federal claim-preclusion principles" to two concurrent federal question suits brought in the same federal court by the same plaintiff on the same claims. *Id*. at 886. "To determine when such improper claim-splitting is present, 'we borrow from the test for claim preclusion.'" *Id*., quoting *Adams*.

---

[10] *Walczak v. Chi. Bd. of Educ.*, 739 F.3d 1013, 1017 (7th Cir. 2014) was a successive litigation case; there was a prior judgment. The Court applied Illinois claim preclusion law.

Similarly, in *Katz v. Gerardi*, 655 F.3d 1212 (10th Cir. 2011), there were "two cases in the same district court, involving the same subject matter, seeking the same claims for relief against the same defendants." *Id.* at 1219. "The district court did not abuse its discretion by dismissing Infinity from this case for claim splitting." *Id.; see also Vanover v. NCO Fin. Servs.,* 857 F.3d 833, 841-42 (11th Cir. 2017) (affirming a discretionary dismissal of plaintiff's second lawsuit pending in the same federal district court, applying claim preclusion principles).

This procedure does not allow a federal court to dismiss a federal case based on concurrent state litigation. *Kanciper v. Suffolk Cty. SPCA, Inc.*, 722 F.3d 88 (2d Cir. 2013).

> Indeed, while plaintiffs "generally have no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant," *Adams v. Cal. Dep't of Health Servs*., 487 F.3d 684, 688 (9th Cir. 2007), "*as between state and federal courts*, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction," [*Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236, 1246 (1976)]* (emphasis supplied) (internal quotation marks omitted).

*Id*. at 92  (emphasis in original, underscoring added.)  "This difference in general approach between state-federal concurrent jurisdiction and wholly federal concurrent jurisdiction stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colo. River Water Conservation Dist.*, 424 U.S. at 817.

In sum, there is not and will not be any simultaneous *parallel* litigation here, only *serial* litigation after a judgment terminating this case and including a remand order. A federal court can only issue a dismissal order based on another federal case pending in the same federal court, and there is none. DISH cites no authority that a federal court has power to enjoin state court litigation, and DISH never requested such an order below.

3.  DISH's Claimed District Court "Weight of Authority" Was Wrongly Decided, and None of It is Binding on this Court

In his opening brief, Fuentes covered all the district court cases DISH cites and will not repeat those points here. (Fuentes Brief at pp. 32-38.) The appellate case law Fuentes has already cited in this brief and his opening brief, and accompanying analysis, suffice.

DISH's cases are illustrative of the errors that courts have made in misapplying Ninth Circuit jurisprudence on §1447(c) and "claim splitting" principles, and in respecting the limits Article III places on their adjudicative powers. Fuentes' cases—*Machlan* and *Rogers*—illustrate a more searching and respectful analysis, both toward the Constitution and the rights granted plaintiffs under state law, that Fuentes believes this Court should follow. (Fuentes Brief at pp. 19-20.)

4.  DISH's Did Not Raise Most of Its Remaining Arguments
    Below, and They Are, In Any Event, Without Merit

In the final pages of its brief, all the arguments DISH raises, except for "waste of resources," were not raised below.  As DISH points out, the Court should exercise discretion to disregard them.  (DISH's Brief at 69, citing *Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010).)  If the Court chooses to consider them, Fuentes responds with the following brief points.

a.  DISH Impermissibly Argues the Merits of the Public Injunction
    Claims

DISH argues that Fuentes has no cognizable claim for injunctive relief, citing several federal court decisions and one California state court decision. (DISH's Brief at pp. 66-67; 69-70.)  This is an impermissible invitation to have the Court adjudicate the merits.  DISH has conceded that the federal courts lack subject matter jurisdiction over these claims.  2-ER-63.  DISH does not dispute, that being so, that federal courts cannot address the merits of those claims. (Fuentes Brief at p. 19.)

At this procedural juncture, the issue is not *whether* Fuentes has requested a viable request for public injunction.  It is, instead, *who* decides that? Article III is clear:  the state court, on remand.

Still, some brief remarks are in order to respond to DISH's merits argument:

The proper standard for a "public injunction" is a question of state law. On questions of state law, state courts are not bound to follow decisions of federal courts, such as *Hodges v. Comcast Cable Communs., Ltd. Liab. Co.*, 21 F.4th 535 (9th Cir. 2021) and the district court progeny DISH cites. *People v. Gonzales & Soliz*, 52 Cal. 4th 254, 296 (2011). The state court on remand would be entirely within its power in ruling contrary DISH's federal cases, and there is every indication from the following cases that it would.

DISH fails to call the Court's attention to any of the California appellate cases that support Fuentes' public injunction claims. *In Maldonado v. Fast Auto Loans, Inc.*, 60 Cal. App. 5th 710 (2021), plaintiffs requested a public injunction against a lender against charging unconscionable interest to borrowers unable to pay the loans. The lender argued that plaintiffs had sought only a private injunction, not a public injunction. The Court of Appeal held, contrary to *Hodges*, that plaintiffs had alleged a valid public injunction because the relief they were seeking was not limited to loans already made, but extended to protecting the future potential borrowers against future unconscionable loans:

> We agree with the Customers' assertion that although "not all members of the public will become customers of [Lender]" this "does not negate the fact that public injunctive relief will nevertheless offer benefits to the general public." The requested injunction cannot be deemed private simply because Lender could not possibly advertise to, or enter into agreements with, every person in California. Such a holding would allow Lender to continue violating the UCL and CLRA because consumers harmed by the unlawful practices would be unable

to act as a private attorney general and seek redress on behalf of the public. It is enough that the requested relief has the purpose and effect of protecting the public from Lender's ongoing harm.

*Id.* at 722.[11]

*Vaughn v. Tesla* expressly declined to follow *Hodges* in light of *Maldonado*. 87 Cal. App. 5th at 231 n.16. The court held that "Defendant asserts that a public injunction is available only as to acts 'that are directed to the entire public,' but it cites no authority supporting that view. Defendant's approach to the issue is inconsistent with that taken by the court of appeal in *Maldonado* …" *Id.* at 231.

Regardless, DISH already raised, and lost, this argument in arbitration and is bound by the ruling. The arbitrator's determination that DISH's arbitration clause was unenforceable was based, in part, on its finding that:

> Claimant's evidence supporting the proposition that the CLRA and UCL claims are being brought for the public benefit (and not as an individual claims) is compelling. While the arbitrator makes no ruling on the merits of the CLRA claim, the evidence on record in this matter raises issues regarding Respondent's practices in offering services to members of the public unable to understand English language documents or navigate Respondent's online portal to retrieve important account documents and notices. The Arbitration Clause, when read as a whole, comprehensively bars Claimant from seeking public injunctive relief in any forum, and it is therefore unenforceable as against Claimant under the *McGill* California Supreme Court decision …

---

[11] The only California case DISH cites, *Clifford v. Quest Software Inc.*, 38 Cal. App. 5th 745 (2019), is not inconsistent with *Maldonado*. *Maldonado* distinguished it. 60 Cal. App. 5th at 720-21.

9-ER-1832, 1834.

DISH's arbitration provisions provide that "[t]he arbitrator's decision and award are final and binding, subject only to the limited court review permitted under the FAA, and judgment on the award may be entered in any court of competent jurisdiction." SER-586, -594 (§12(D)). DISH never contested the arbitrator's decision. Therefore, at least as to Fuentes himself, DISH's arbitration provisions bind DISH to the arbitrator's award and preclude DISH from now contesting that Fuentes has sought a public injunctive relief remedy.

b.    A "Waste of Resources" Cannot Create Jurisdiction

Judicial economy is not an exception to the jurisdictional limitations of Article III, and cannot confer jurisdiction where none exists.

> Objections to subject-matter jurisdiction, however, may be raised at any time. Thus, a party, after losing at trial, may move to dismiss the case because the trial court lacked subject-matter jurisdiction. Indeed, a party may raise such an objection even if the party had previously acknowledged the trial court's jurisdiction. And if the trial court lacked jurisdiction, many months of work on the part of the attorneys and the court may be wasted.

*Henderson v. Shinseki,* 562 U.S. 428, 434-35 (2011), internal citations omitted.

DISH is wrong that remand would be a waste of resources because the parties can just pick up where they left off in federal court. (Fuentes Brief at pp. 36-37.)

56

DISH had a right to remove, but by choosing to do so, DISH introduced the jurisdictional risks now confronting it, and took on its still-present burden of sustaining it throughout the litigation. *Love v. Villacana*, 73 F.4th 751, 755 (9th Cir. 2023) ("Upon removal, a defendant assumes voluntarily 'the burden of establishing federal jurisdiction'", quoting *Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 682-83 (9th Cir. 2006).

     c.    DISH's Attempt to Shift Its Jurisdictional Risks onto Fuentes Is Irrelevant and Unfounded

DISH blames Fuentes for the jurisdictional challenge it now faces. (DISH's Brief at pp. 69-70.) DISH's statement that Fuentes "manufactured, at the eleventh hour, a purported basis to remand a portion of his claim" reflects its own self-interested speculation and is unfounded. (DISH's Brief at p. 71; see also p. 68.)

As the Supreme Court made clear in *Henderson*, a party's conduct—good, bad, or indifferent—cannot confer Article III jurisdiction. Jurisdiction cannot be conferred by waiver, conduct, or consent of the parties. *Sosna v. Iowa*, 419 U.S. 393, 398 (1975); *Giannakos v. M/V Bravo Trader*, 762 F.2d 1295, 1297 (5th Cir. 1985). After a long trial, a party's backtracking on prior admissions of jurisdiction cannot vest the court with jurisdiction. *Henderson*, 562 U.S. at 434.

Turning to DISH's "manufacturing" charge, when the class certification motion was filed in early January 2021, Fuentes stated: "I am unwilling and unable to subscribe again in the future because DISH has not changed its practices. I am

unwilling to buy DISH again until it provides Spanish language contracts to sign and allows us cancellation rights to prevent problems like the one I had."  4-ER-616 (¶21).  His counsel believed that this sufficed to support Article III jurisdiction under *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970-72 (9th Cir. 2017). Dkt. 140 at p. 12, n. 3.

In the two years between January 2021 and the filing of the remand motion in March 2023, decisions from the Ninth Circuit and the District Judge in the case, as well as other district court decisions, interpreted *Davidson* restrictively, as requiring *an intention* or *desire* to purchase a product in the future in order to sustain Article III jurisdiction for injunctive relief.  2-ER-77 (citing *In re Coca-Cola Prod. Mktg. & Sales Pracs. Litig. (No. II)*, No. 20-15742, 2021 WL 3878654, at *4 (9th Cir. Aug. 31, 2021); *Hanscom v. Reynolds Consumer Prod. LLC*, No. 21-CV-03434-JSW, 2022 WL 591466, at *4 (N.D. Cal. Jan. 21, 2022) (to establish standing for injunctive relief "a plaintiff must allege they would want to or intend to purchase the product in the future.")

Fuentes did not say that he "intended" or even "wanted" to resubscribe to DISH.  He stated that he was *unwilling* to resubscribe until DISH changed his practices.  4-ER-616 (¶21).  That was insufficient under *Coca-Cola* and *Hanscom*. Fuentes could not honestly meet that standard, and the remand motion ensued.

**CONCLUSION**

The Court should affirm the district court's order on the HSSA, CLRA, and

UCL claims, and reverse the order denying the Motion to Remand.

Respectfully submitted on December 18, 2023,

/s/ Elliot J. Conn
Elliot J. Conn
CONN LAW, PC
ELLIOT J. CONN
Cal. Bar No. 279920
354 Pine St., 5th Floor
San Francisco, CA 94104

HOUSING & ECONOMIC RIGHTS
ADVOCATES
ARTHUR D. LEVY
Cal. Bar No. 095659
610 – 16th Street, Suite 420
Oakland, CA  94612

# CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s) 23-15865, 23-15989**

I am the attorney or self-represented party.

I certify that this brief complies with the word limit of Cir. R. 32-1 because this brief contains 13,276 words excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated December 18, 2023,

/s/ Elliot J. Conn

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-15865, 23-15989

I am the attorney or self-represented party.

**This brief contains** | 13,276 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

⦿ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Elliot J. Conn | **Date** | 12/18/2023

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*